1

2

3

4

5

6 # UNITED STATES DISTRICT COURT

7 ## EASTERN DISTRICT OF CALIFORNIA

8

| | | |
|---|---|---|
| ALFRED PAUL GALAZ, | ) | 1:04-cv-05383-TAG HC |
| | ) | |
| | ) | ORDER DENYING FIRST AMENDED |
| Petitioner, | ) | PETITION FOR WRIT OF HABEAS |
| | ) | CORPUS (Doc. 9) |
| | ) | |
| vs. | ) | ORDER DIRECTING CLERK OF COURT |
| | ) | TO ENTER JUDGMENT |
| | ) | |
| C. HARRISON, Warden, | ) | |
| | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |
| | ) | |
| _____ | ) | |

17        Petitioner is a state prisoner proceeding pro se and in forma pauperis with a Petition for

18 Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254.

19                                    PROCEDURAL HISTORY

20        **A.  State Court Proceedings**

21        Petitioner is in custody of the California Department of Corrections and Rehabilitation

22 serving an indeterminate sentence of 16 years-to-life pursuant to a judgment of the Superior

23 Court of California, County of Tulare (the "Superior Court").  (Clerk's Transcript on Appeal

24 ("CT") 240-241 ).  On July 31, 2000, Petitioner was convicted by jury trial of second-degree

25 murder.  (Cal. Pen. Code § 187(a)).  (Id.).  The jury also found true a special allegation that

26 Petitioner had used a deadly weapon in the commission of the murder.  (Cal. Pen. Code

27 § 12022(b)(1)).  (Id.).

28 ///

1    Petitioner filed a direct appeal in the California Court of Appeals, Fifth Appellate District

2    (the "5th DCA"), challenging the trial court's decision to instruct the jury with CALJIC Nos.

3    5.17, 2.06, and 2.11.5.  (Doc. 35, Lodged Document ("LD") 1).  Petitioner also challenged the

4    failure of the trial court to instruct the jury on imperfect self-defense and its failure to instruct the

5    jury that a witness, Rafael Mesa ("Mesa"), could be deemed an accomplice.  (Id.).

6    On August 27, 2002, the 5th DCA, in an unpublished decision, affirmed Petitioner's

7    conviction and sentence.  (Id.).  Petitioner timely filed a petition for review in the California

8    Supreme Court raising those same grounds.  (Doc. 35, LD 2).  On November 20, 2002, the

9    California Supreme Court denied Petitioner's petition for review.  (Doc. 35, LD 3).

10    On May 4, 2004, Petitioner filed a state habeas petition with the Tulare County Superior

11    Court; the Superior Court denied the habeas petition on May 11, 2004.  (Doc. 35, LD 4, 5).  On

12    June 29, 2004, Petitioner filed a state habeas petition in the 5th DCA, which was denied on

13    August 13, 2004.  (Doc. 35, LD 6, 7).  Finally, Petitioner filed a state habeas petition in the

14    California Supreme Court raising four issues: (1) ineffective assistance of trial counsel in not

15    objecting to comments of the prosecutor in closing argument; (2) ineffective assistance of trial

16    counsel in refusing to investigate three instances of alleged juror misconduct; (3) ineffective

17    assistance of trial counsel in not interviewing available defense witnesses; and (4) ineffective

18    assistance of appellate counsel in abandoning the investigation of juror misconduct.  (Doc. 35,

19    L D 8).  The California Supreme Court denied the petition on November 10, 2004.  (Doc. 35,

20    L D 9).

21    **B.  The Instant Petition.**

22    On March 1, 2004, Petitioner filed the instant petition for writ of habeas corpus in the

23    United States District Court for the Eastern District of California, Sacramento Division. (Doc. 1).

24    On March 5, 2004, by order of the Court, the case was transferred to the United States District

25    Court for the Eastern District of California, Fresno Division.  (Doc. 3).  On April 6, 2004, this

26    court ordered Petitioner to show cause why his petition for writ of habeas corpus should not be

27    dismissed for filing the petition outside the one-year statute of limitations period.  (Doc. 7).  The

28    court also ordered Petitioner to file an amended petition.  (Id.).

2

1    On May 5, 2004, Petitioner filed an amended petition raising the issues contained in

2  Petitioner's direct appeal in state court.  (Doc. 9).  Petitioner also filed a response to the order to

3  show cause why the petition should not be dismissed.  (Doc. 10). On June 7, 2004, the Magistrate

4  Judge assigned to the case filed a report and recommendation which recommended dismissal of

5  Petitioner's petition as untimely.  (Doc. 11).  Petitioner filed objections to the report and

6  recommendation on July 6, 2004, asserting equitable tolling because his mental incapacity had

7  precluded him from timely filing his petition. (Doc. 12).  Specifically, Petitioner claimed that for

8  a period of time immediately preceding the filing deadline for his federal petition, he had been on

9  a "suicide watch" in the prison and unable to work on his petition.  (Id.).

10    On August 26, 2004, the Court ordered Petitioner to provide further documentation to

11  support his claims regarding his mental condition, and expressly ordered the record expanded to

12  include such supplemental documentation.  (Doc. 13).  Petitioner complied on December 6,

13  2004. (Docs. 15 & 16).  His supplemental filing also included the four new claims ("the

14  supplemental filing") that had recently been rejected, on November 10, 2004, by the California

15  Supreme Court.   In light of Petitioner's additional documentation, the Court discharged the order

16  to show cause, vacated the earlier report and recommendation, and ordered Respondent to file a

17  response.  (Docs. 17 & 18).  The Court construed Petitioner's supplemental documentation as a

18  request to supplement the petition and granted the request.  (Doc. 18).

19    On March 2, 2005, Respondent filed a motion to dismiss, claiming that Petitioner had

20  filed his federal petition beyond the one-year statute of limitations.  (Doc. 20).  Petitioner

21  opposed the motion to dismiss with documents again alleging that equitable tolling should apply

22  because of his prior mental incapacity. (Doc. 26).  Respondent filed a reply to Petitioner's

23  opposition (Doc. 29), and  Petitioner filed a response to Respondent's reply.  (Doc. 30).   On

24  March 27, 2006, the Court denied Respondent's motion to dismiss, concluding that Petitioner

25  had established sufficient equitable tolling to make his petition timely under the AEDPA.[1]

26  (Doc. 33).

27  ///

28

---

[1]The Antiterrorism and Effective Death Penalty Act of 1996 ("the AEDPA").

1    Upon written consent of the parties, this action was assigned to the Magistrate Judge for

2   all purposes, by order dated April 5, 2005.  (Doc. 24).

3    On June 23, 2006, Respondent filed his answer to the amended petition.  (Doc. 34).  On

4   September 26, 2006, Petitioner filed his Traverse.  (Doc. 40).  Respondent concedes that

5   Petitioner's grounds for relief in the amended petition, "to the extent interpreted by Respondent,"

6   have been fully exhausted.  (Doc. 34, p. 2).  However, Respondent contends that the four claims

7   in the supplemental filing are untimely under the AEDPA.

8                         **FACTUAL BACKGROUND**

9    The Court hereby adopts the Statement of Facts contained in the 5th DCA's unpublished

10   opinion in this case:

11      On January 13, 1999, Julio Lam, a Guatemalan electrician working in Farmersville,
        borrowed his manager's van to visit his girlfriend.  Some time later, Mr. Lam consumed a
12      large quantity of alcohol[2] and crashed the van in the foggy night.  It rolled over, smashing
        the windows and crushing the roof.

13
        Appellant spent the evening of January 13, 1999, drinking and hanging out with three of
14      his friends, Rafael Mesa, his de facto stepbrother, Ramon Camarillo, a neighbor, and
        M.S., appellant's minor cousin.  At around 11:00 p.m. they decided to go out for more
15      beer.

16      Mesa drove the group in his car.  Appellant sat in the front passenger's seat, Camarillo sat
        behind appellant, and M.S. sat behind Mesa.  They stopped at the Mobile Gas Station
17      where Camarillo's sister was working to ask her for money, but she had none to give
        them, so they went next door to the Union 76 station.  As they pumped a few dollars of
18      gas into the car, Lam approached appellant and asked for a ride home.  Mesa assented,
        and appellant slid over so that Lam could sit in the front seat by the passenger's door.
19      The man, who spoke mostly in Spanish, gave directions to appellant and appellant
        translated the directions for Mesa.  The party was unable to find Mr. Lam's house, and it
20      seemed that Lam did not know where he was going.

21      At this point, the stories of the two eyewitnesses, Mesa and Camarillo, diverge.

22      **1. Camarillo**

23      Camarillo testified that they returned to the gas station to get rid of Lam and give
        Camarillo's sister a ride home.  The station was closed, however, and Camarillo's sister
24      gone.  Lam got out of the vehicle, but then got back in, and they drove off again.  Mesa
        commented that Lam was taking too long to tell them how to get him home.  While they
25      were driving, appellant asked to see the box-cutting knife Camarillo usually carried.
        Camarillo didn't feel quite right about the request so he didn't pass him the knife.
26      Minutes later, appellant asked Camarillo for Mesa's baseball bat, which was in the
        backseat.  Camarillo passed it to him without thinking about it.  Appellant made both
27      requests in a perfectly normal tone of voice.

28
        ───────────────
        [2]The autopsy findings calculated Mr. Lam's blood alcohol content as .13 percent.

                                        4

Camarillo believed that appellant initially pushed Lam in the ribs with the bat. He testified that he saw Lam recoil and say "ah, ah" and saw appellant with the bat in his hands, but did not actually see the bat strike Lam in the car. Appellant told Lam to get out of the car. Lam complied; appellant followed with the bat.

When Camarillo looked out the rolled-down front passenger's window, he saw appellant hitting Lam with the bat. Camarillo believed he saw appellant hit Lam on the back while Lam was still standing. Camarillo jumped out of the car to restrain appellant, grabbed him from behind and tried to pull appellant away. Appellant resisted and Camarillo took a blow to his leg as appellant swung at Lam.[3] The entire assault lasted perhaps a minute or two, Camarillo thought it ended after he was struck; he said "You got him, Alfred." Mesa and M.S. never left the car.

Appellant and Camarillo got back in Mesa's car; appellant took the bat with him. Camarillo could not recall what was said in the car as they drove back to appellant's residence. Once they arrived, M.S. ran home. Some 10 minutes later, appellant said they should go back and get Lam's wallet. Mesa, appellant and Camarillo returned to the intersection where Lam's body lay. They all exited the vehicle. Mesa and Camarillo stood away from the body and said nothing while appellant retrieved Lam's wallet from his pocket. Appellant took the money out of the wallet and threw the rest of the contents out the car window. Someone suggested that they get more beer, which they did.

On returning to appellant's residence, the threesome noticed that appellant and Camarillo had blood on their clothes. They ran their clothes through appellant's washing machine. Appellant seemed nervous, but he told Mesa and Camarillo not to worry, that nothing would happen to them.

Camarillo went to work at 6: a.m. that morning, as scheduled. His co-worker, Linda Candelaria, described Camarillo as atypically quiet, nervous and depressed. Candelaria testified that Camarillo told her he felt sick and wanted to go home early, then he "broke down" and made a statement to her which she related to the police.

## 2. Mesa

Mesa denied that M.S. was ever in his car the night of January 13, 1999. He also claimed that Lam started the fight. "[T]he guy hit Alfred, assaulted Alfred and Alfred got offended," thus appellant "hit [Lam] because he got offended."

Mesa testified that Lam had a folding pocketknife. Mesa maintained he got a good look at the knife despite the fact that it was a foggy night, and the car had no interior light. The knife was entirely made of bright shiny chrome and the blade was approximately four and a half inches long. Mesa could clearly see the word "Stainless" on the blade in the light generated by a street lamp. Mesa never told anyone that Lam had a knife prior to his trial testimony, but was elusive as to why he had not shared this information. [Footnote omitted.]

Appellant and Lam had been arguing a bit in a medium low tone of voice prior to Lam's drawing the knife. Lam sounded angry, but Mesa did not know why because he could not understand Spanish. Mesa testified he was driving leaning over "keeping an eye on" Lam because he didn't trust him. Thus he had a good look at Lam as he stealthily pulled the knife from his right boot with the right hand and quietly extended the blade. Lam assaulted appellant with his left arm, raising it up in a bent position slightly above the breast, but below the shoulder.

---

[3]The jury was shown the resulting scar on Camarillo's leg.

Mesa didn't hear appellant ask for the bat; someone in the backseat must have seen appellant being assaulted. Mesa was certain that appellant never asked for any other weapon. Camarillo handed appellant the bat and appellant and Lam began struggling and fighting in the car. Mesa saw Lam gesture toward appellant with the knife after the bat was passed to appellant.

Appellant hit Lam in the head with the bat twice while they were in the car. Mesa recalled saying, "Get him out of the car. Get him out of the car." Appellant and Lam both exited the vehicle and Mesa didn't see the knife again until they returned to the scene. In fact, he did not watch the balance of the confrontation as he sat in the car in shock. He denied hearing anything, although he recalled Camarillo getting out of the car to get Alfred. The whole affair lasted only seconds. Appellant brought the bat back inside the car.

On returning to Lam's body, Mesa saw the knife on the curb. He picked up the knife "just to take it." He also kept Lam's wallet, which he put in a bag under his bed. Mesa testified that after he returned to his home, he threw the knife away somewhere; he was not sure where.

Mesa, Camarillo and appellant were arrested and interrogated on January 14, 1999. Mesa's trial testimony was substantially impeached with his tape-recorded statement to Tulare County Sheriff's deputies.

### 3. Mesa's Statement

In Mesa's pretrial version of the events of January 13th and 14th, he stated M.S. had been with them in the car. Lam's poor directions to his house led them to a freeway overpass. Mesa got tired of fruitlessly driving around in the fog and suggested that they just drop him off back at the gas station. They did, but Mesa changed his mind because he didn't want Lam to have to walk. As they reached the intersection of Prosperity and Oak, appellant told Mesa that Lam's house was "right there." Mesa said, "And then I guess Alfred was, he just flipped I guess so he got the baseball [bat] and started hitting him right there."

Appellant told Camarillo to give him the bat, in Mesa's opinion "cause I guess the guy pissed off Alfred." Appellant hit Lam twice in the forehead with the bat. Mesa yelled for appellant to get Lam out of his car; appellant hit Lam with the bat again and Camarillo and appellant pushed him out of the car. Appellant followed. He hit Lam once while Lam was still standing. M.S. yelled for someone to stop appellant, and Camarillo got out of the car. Lam fell face first into the grass after appellant landed another blow. Appellant broke loose from Camarillo and hit Lam twice more in the back of the head.

Appellant wanted to go back for Lam's wallet, so they did. It contained only one dollar. Appellant threw all the cards and papers in Lam's wallet out the car window as they returned to appellant's residence. Mesa kept the wallet. Sheriff's deputies recovered it from a bag under Mesa's bed.

At trial, Mesa maintained that he did not tell the officers half of the truth. He further described himself as a little buzzed and claimed not to remember much of what he said to the interrogating officers. Indeed, he felt pressured to say certain things because they were "getting at [him], you know, asking [him] all those questions." Mesa pled guilty to being an accessory to the murder after the fact (Pen. Code, § 32) and to receiving stolen property (Pen. Code, § 496). He was sentenced to three years felony probation and testified at trial under a grant of immunity.

///

**4. Forensic Evidence**

A passerby reported Lam's body in the early morning hours of January 14, 1999. Personnel responding to the scene observed blood and brain splattered on the road. Several bloody footprints photographed near Lam's body were consistent with the shoes worn by appellant on the night of the beating. Lab testing revealed at least two types of blood on Mesa's floor mats, one of which was consistent to that of Lam's. Appellant had no wounds on him when he was interviewed on January 14, 1999.

Glass consistent with the broken windshield on Lam's vehicle was found on Lam and in Mesa's car. A folding knife with a six-inch blade was found in Mesa's car, but no knife was found at the scene of the assault. Police also recovered papers and a credit card bearing Lam's name from alongside the road as described by Mesa.

Dr. Leonard Miller, a pathologist, performed Mr. Lam's autopsy. He determined the cause of death was a large skull fracture on the left rear of the head. Although Mr. Lam initially appeared to the be victim of a hit and run, Dr. Miller concluded that the fracture was caused by significant blunt force trauma to the back and side of Lam's skull. All of the trauma and lacerations were to Mr. Lam's head. There were no injuries to Lam's arms, shoulders or chest; Lam had no offensive or defensive wounds. Dr. Miller believed that Lam was struck at least three times from behind and to his side. The wounds were consistent with Mesa's baseball bat.

(Doc. 35, LD 1, pp. 2-8).

## DISCUSSION

### I. Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution. The challenged conviction arises out of the Tulare County Superior Court, which is located within the jurisdiction of this court. 28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d). Accordingly, the Court has jurisdiction over this action.

On April 24, 1996, Congress enacted the AEDPA, which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997), cert. denied, 522 U.S. 1008, 118 S.Ct. 586 (1997); Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997), cert. denied, 520 U.S. 1107 (1997), overruled on other grounds by, Lindh v. Murphy, 521 U.S. 320 (holding the AEDPA only applicable to cases filed after statute's enactment). The instant petition ///

1  was filed on March 1, 2004, after the enactment of the AEDPA, and thus it is governed by the

2  AEDPA.

3  **II.  Legal Standard of Review**

4       A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless

5  the adjudication of a prisoner's claim (1) "resulted in a decision that was contrary to, or involved

6  an unreasonable application of, clearly established Federal law, as determined by the Supreme

7  Court of the United States" or (2) resulted in a decision that "was based on an unreasonable

8  determination of the facts in light of the evidence presented in the State court proceeding."

9  28 U.S.C. § 2254(d);  Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003);  Williams v. Taylor, 529

10  U.S. at 412-413.

11       The first prong of federal habeas review involves the "contrary to" and "unreasonable

12  application" clauses of 28 U.S.C. § 2254(d)(1).  This prong pertains to questions of law and

13  mixed questions of law and fact.  Williams v. Taylor, 529 U.S. at 407-410;  Davis v. Woodford,

14  384 F.3d 628, 637 (9th Cir. 2004).  A state court decision is "contrary to" clearly established

15  federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme

16  Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a

17  [Supreme Court] decision but reaches a different result."  Brown v. Payton, 544 U.S. 133, 141

18  (2005), citing Williams v. Taylor, 529 U.S. at 405.  A state court decision involves an

19  "unreasonable application" of clearly established federal law "if the state court applies [the

20  Supreme Court's precedents] to the facts in an objectively unreasonable manner."  Brown v.

21  Payton, 544 U.S. at 141.  Consequently, a federal court may not grant habeas relief simply

22  because the state court's decision is incorrect or erroneous; the state court's decision must also be

23  objectively unreasonable.  Wiggins v. Smith, 539 U.S. 510, 511 (2003),  citing Williams v.

24  Taylor, 529 U.S. at 409.  Section 2254(d)(1)'s reference to "clearly established Federal law" refers

25  to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the

26  relevant state-court decision."  Williams v. Taylor, 529 U.S. at 412; Lockyer v. Andrade, 538 U.S.

27  at 412; Barker v. Fleming, 423 F. 3d 1085, 1093 (9th Cir. 2005).

28  ///

8

1    The second prong of federal habeas review involves the "unreasonable determination"

2    clause of 28 U.S.C. § 2254(d)(2).  This prong pertains to state court decisions based on factual

3    findings.  Davis v. Woodford, 384 F.3d at 637, citing Miller-El v. Cockrell, 537 U.S. 322 (2003).

4    Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the

5    petitioner's claims "resulted in a decision that was based on an unreasonable determination of the

6    facts in light of the evidence presented in the State court proceeding."  Wiggins v. Smith, 539 U.S.

7    at 520;  Jeffries v. Wood, 114 F.3d at 1500 (when reviewing a state court's factual determinations,

8    a "responsible, thoughtful answer reached after a full opportunity to litigate is adequate to support

9    the judgment").  A state court's factual finding is unreasonable when it is "so clearly incorrect that

10   it would not be debatable among reasonable jurists."  Id. ; see Taylor v. Maddox, 366 F.3d 992,

11   999-1001 (9th Cir. 2004), cert.denied, Maddox v. Taylor, 543 U.S. 1038 (2004).  The AEDPA

12   also requires that considerable deference be given to a state court's factual findings. A state

13   court's factual findings are  presumed to be correct, and such presumption of correctness may be

14   rebutted only by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

15   To determine whether habeas relief is available under § 2254(d),  the federal court looks to

16   the last reasoned state court decision as the basis of the state court's decision.  Robinson v.

17   Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  Where the state court decided the petitioner's

18   claims on the merits but provided no reasoning for its decision, the federal habeas court must

19   independently review the record to determine whether habeas corpus relief is available under

20   § 2254(d).  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Delgado v. Lewis, 223 F.3d

21   976, 981-982 (9th Cir. 2002).  Where the state court denied the petitioner's claims on procedural

22   grounds or did not decide such claims on the merits, the deferential standard of the AEDPA do

23   not apply and the federal court must review the petitioner's 's claims de novo.  Pirtle v. Morgan,

24   313 F.3d 1160, 1167 (9th Cir. 2002).

25   **III.  Review of Petitioner's Claims**

26   The amended petition alleges the following as grounds for relief:

27   **Ground One          The trial court erred in giving CALJIC No. 5.17.**

28   **Ground Two          The trial court erred in giving CALJIC No. 2.06.**

| | |
|---|---|
| **Ground Three** | **The trial court erred in giving CALJIC No. 2.11.5.** |
| **Ground Four** | **The trial court committed error in refusing to submit to the jury the question of whether or not Rafael Mesa was an accomplice.** |
| **Ground Five** | **The trial court erred in not sua sponte instructing the jury on the burden of proof in a self-defense case.** |

The supplemental filing of December 6, 2004 raises these additional grounds for relief:

| | |
|---|---|
| **Ground Six** | **Ineffective assistance of trial counsel in failing to object to prosecutor's misstatement of law regarding CALJIC No. 2.06** |
| **Ground Seven** | **Ineffective assistance of trial counsel for not investigating instances of juror misconduct.** |
| **Ground Eight** | **Ineffective assistance of trial counsel in not utilizing experts or investigator services.** |
| **Ground Nine** | **Ineffective assistance of appellate counsel for abandoning the juror misconduct issue.** |

**III.a   Claims in the amended petition**

    **A. Ground One**    **The trial court erred in giving CALJIC No. 5.17**

Because four of the five claims in the amended petition refer to erroneously given or withheld jury instructions, the Court begins with a review of the standards required for Petitioner to establish  entitlement to habeas relief based on state instructional error.

    **(1)  Federal Habeas Law Regarding Review Of State Court Instructional Errors**

Petitioner's burden is to establish that the state court's failure to instruct on circumstantial evidence rose to the level of a federal constitutional error.  Generally, the issue of whether a jury instruction is a violation of state law is neither a federal question nor a proper subject for habeas corpus relief. Estelle v. McGuire, 502 U.S. 62, 68 (1991). ("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.' "), quoting Lewis v. Jeffers, 497 U.S. 764, 780 (1990); Gilmore v. Taylor, 508 U.S. 333, 348-49 (1993) (O'Connor, J., concurring) ("mere error of state law, one that does not rise to the level of a constitutional violation, may not be corrected on federal habeas").  Thus, normally, a claim that challenges the propriety of a jury instruction under state law cannot reasonably be construed to allege a deprivation of federal rights. Van Pilon v. Reed, 799 F.2d 1332, 1342 (9th Cir. 1986).  Federal courts are bound by state

///

1  court rulings on questions of state law. Oxborrow v. Eikenberry, 877 F.2d 1395, 1399 (9th Cir.

2  1989).

3      A challenge to a jury instruction solely as an error under state law does not normally state

4  a claim cognizable in a federal habeas corpus action. See Estelle v. McGuire, 502 U.S. 62, 71-72

5  (1991). To obtain federal collateral relief for errors in the jury charge, the petitioner must show

6  that the ailing instruction by itself so infected the entire trial that the resulting conviction violates

7  due process. See id. at 72.   The constitutional significance of the omission of an instruction will

8  depend upon the evidence in the case and the overall instructions given to the jury.  See Duckett v.

9  Godinez, 67 F.3d 734, 745 (9th Cir. 1995); see also Henderson v. Kibbe, 431 U.S. 145, 155

10  (1977).

11      Additionally, the instruction may not be judged in artificial isolation, but must be

12  considered in the context of the instructions as a whole and the trial record. Id. The Court must

13  evaluate jury instructions in the context of the overall charge to the jury as a component of the

14  entire trial process. See United States v. Frady, 456 U.S. 152, 169 (1982), citing Henderson v.

15  Kibbe, 431 U.S. at 154.  Furthermore, even if it is determined that the instruction violated the

16  petitioner's right to due process, the petitioner can only obtain relief if the unconstitutional

17  instruction had a substantial influence on the conviction and thereby resulted in actual prejudice

18  under Brecht v. Abrahamson, 507 U.S. 619, 637 (whether the error had a substantial and injurious

19  effect or influence in determining the jury's verdict.). See Hanna v. Riveland, 87 F.3d 1034, 1039

20  (9th Cir. 1996).

21      The burden of demonstrating that an erroneous instruction was so prejudicial that it will

22  support a collateral attack on the constitutional validity of a state court's judgment is even greater

23  than the showing required to establish plain error on direct appeal. Henderson v. Kibbe, 431 U.S.

24  at 154.  Moreover, an individual whose claim involves the *omission* of an instruction "bears an

25  especially heavy burden," because an omission is less likely to be prejudicial than a misstatement

26  of the law.  Id. at 155.

27  ///

28  ///

11

1    **(2)  Petitioner Has Failed To Establish That Giving CALJIC No. 5.17 Was Error**

2         Petitioner contends that the trial court erred by instructing the jury with CALJIC No. 5.17.

3    (Doc. 9, p. 2).  Petitioner contends that the instruction is erroneous under state law and also that it

4    "obscured the true requirements of malice aforethought as a predicate for second-degree murder

5    conviction and unduly restricted appellant's defense of unreasonable self-defense," thus violating

6    Petitioner's Sixth and Fourteenth Amendment rights.  (Id. at p. 8).  This contention lacks merit.

7         At trial, the jury was instructed with CALJIC No. 5.17, as follows:

8         A person, who kills another person in the actual but unreasonable belief in the necessity to
          defend against imminent peril to life or great bodily injury, kills unlawfully, but does not
9         harbor malice aforethought and is not guilty of murder.  This would be so even though a
          reasonable person in the same situation seeing and knowing the same facts would not have
10        the same belief.  Such an actual but unreasonable belief is not a defense to the crime of
          voluntary manslaughter.

11
          As used in this instruction, an "imminent" peril or danger means one that is apparent,
12        present, immediate, and must be instantly dealt with, or must so appear at the time to the
          slayer.
13
          However, this principle is not available, and malice aforethought is not negated, if the
14        defendant by his unlawful or wrongful conduct created the circumstances which legally
          justified his adversary's use of force or attack.
15
     (CT 198; Reporter's Transcript on Appeal ("RT") 473).
16
          California recognizes imperfect self-defense in homicide cases where the killing resulted
17
     from an "actual but unreasonable belief in the necessity to defend against imminent peril to life or
18
     great bodily injury."  Menendez v. Terhune, 422 F.3d 1012, 1028 (9th Cir. 2005), quoting
19
     CALJIC No. 5.17 (1995); see In re Christian S., 7 Cal.4th 768, 771 (1994).  If imperfect self-
20
     defense is established, the defendant can be guilty of no more than manslaughter because the
21
     requisite malice necessary for murder is absent.  In re Christian S., 7 Cal.4th at 771.  Though a
22
     reasonable person need not view the peril as imminent, the defendant must make some showing
23
     that he actually believed the peril to be imminent.  Id.  The fear, no matter how great, cannot be of
24
     prospective danger or even one that is in the near future.  Id. at 783.  Moreover, under California
25
     law, a defendant is entitled to a jury instruction only "if substantial evidence, or evidence
26
     sufficient to deserve consideration by the jury," supports the giving of that instruction.  People v.
27
     Barton, 12 Cal.4th 186, 201 & n. 8 (1995).
28

In its unpublished decision, the 5th DCA rejected Petitioner's contention as follows:

The offending paragraph of CALJIC No. 5.17 is, contrary to appellant's contentions, correct in law.  It derives, nearly word for word, from the Supreme Court's decision in In re Christian S., (1994) 7 Cal.4th 768 (*Christian*):

"It is well established that the ordinary self-defense doctrine - - applicable when a defendant reasonably believes that his safety is endangered - - may not be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical assault or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified. [Citations.] It follows, a fortiori, that the imperfect self-defense doctrine cannot be invoked in such circumstances.  For example, the imperfect self-defense doctrine would not permit a fleeing felon who shoots a pursuing police officer to escape a murder conviction even if the felon killed his pursuer with an actual belief in the need for self-defense." (Id. at p. 773, fn. 1.)

Camarillo testified that appellant initiated a physical assault upon Lam by pushing him with the bat.  In his pretrial statement, Mesa said appellant hit Lam "because he just flipped," he did not identify any provocation by Lam.  As malice is implied "when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart," appellant could properly be convicted of murder if the jury credited this testimony. (Pen. Code, § 188).

Accordingly, the last paragraph of CALJIC No. 5.17 was appropriately given and correctly state the applicable law. "The instruction correctly states the law, and defendant did not request clarification or amplification.  He has therefore waived the issue on appeal. [Citations.]" (People v. Bolin (1998) 18 Cal.4th 297, 328.)  Appellant's complaints that CALJIC No. 5.17 fails to define "wrongful conduct" and "legally justified" should have been addressed to the trial court through a request for an amplifying instruction.

Furthermore, appellant's contention that an aggressor may assert imperfect self defense unless he was the first to use deadly force arises from a misinterpretation of the phrase "deadly affray."  Unreasonable or imperfect self-defense merely removes the element of malice aforethought from a charge of murder; the principle is only applicable to homicides, i.e., deadly affrays.  Accordingly, the instigator of a deadly affray may not claim either reasonable or unreasonable self-defense, regardless of whether he was the first to use deadly force....

...

Thus, in People v. Seaton. (2001) 26 Cal.4th 598, our high court found no error in refusing to instruct on imperfect self defense where the defendant struck the victim with his fist and the victim struck back at the defendant with a hammer. "Because, however, defendant's testimony showed him to be the initial aggressor and the victim's response legally justified, defendant could not rely on unreasonable self-defense as a ground for voluntary manslaughter." (Id. at p. 664.)

The Flannel and Christian cases do not stand for the proposition that an aggressor is entitled to an imperfect self-defense instruction as long as his opponent was the first to use deadly force.  Although the Supreme Court first explained imperfect self-defense in Flannel, it found no error in the trial court's failure to sua sponte instruct on the theory.  In Christian, the victim was the aggressor, he chased defendant, repeatedly threatening "to get him" and challenging him to fire his weapon.  The victim halted his advance only when the defendant pointed his gun at him.  Finally, after additional taunting by the victim, the defendant shot and killed him.  On this record, the Supreme Court could not

///

13

determine whether the defendant had an actual belief in the need to defend himself, and on remand, directed the trial court to enter a finding in this regard.

Here, only Mesa's trial testimony suggested that Lam attempted a physical assault. Mesa's testimony, however, was equivocal as to who started the altercation. He stated both "he [appellant] was trying to block away from the knife from what the guy was doing, and that's when the bat was given to Alfred," and "the bat was being given to Alfred, and that's when he [Lam] started doing the, you know, trying to assault Alfred. <u>Assuming the jury accepted both Camarillo's testimony that appellant hit Lam with "kind of like a push" and Mesa's testimony that Lam responded with a knife, the one scenario under which appellant contends the jury could have been mislead [sic], appellant did not commit a simple assault to which Lam overreacted. Appellant assaulted Lam with a deadly weapon. He hit Lam hard enough that he cried out and moved. Under these circumstances, Lam would have been justified in using a knife to defend himself.</u> (Footnote omitted).

(Doc. 35, LD 1, pp. 9-11)(Emphasis supplied).

The 5th DCA also pointed out that the jury "was instructed with the full panoply of jury instructions with respect to lawful and unlawful homicide," and thus the jury "was properly equipped to decide whether appellant's use of force was legally justified." (<u>Id.</u> at p. 11, fn. 4). It is apparent from the foregoing passage, that the state court, in a reasoned decision, concluded that CALJIC 7.17 correctly stated California law and that the instruction was correctly given to the jury according to the state of the evidence and California law. Thus, the only question remaining for this Court is to determine whether even this properly worded and correctly applied state instruction somehow violates federal due process. It does not.

Petitioner's federal claim is based on the fallacious premise that the last paragraph of the challenged instruction could mislead a jury to reject imperfect self-defense "in the erroneous belief that [Petitioner] had committed a 'wrongful act' that deprived him of the right to claim unreasonable self-defense." (Doc. 9, p. 7). In its opinion, however, the 5th DCA explained that in the only scenario in which such an eventuality could occur, i.e., where Lam responded to Petitioner's push by drawing a knife, Petitioner's push was sufficient to permit Lam to draw a knife in self-defense. Thus, even under Petitioner's "best-case" scenario, he was not entitled to use deadly force.

Moreover, the Court cannot conclude that the state court's giving of the challenged instruction, as worded, resulted in prejudice to the petitioner by "ha[ving] a substantial and injurious effect or influence in determining the jury's verdict." <u>Brecht</u>, 507 U.S. at 637. Nothing in the instruction itself reasonably could have confused or misled the jurors regarding whether

14

1   "imperfect self-defense" was proven in this case.  At trial, the evidence established that, *viewing*

2   *the evidence in the light most favorable to Petitioner*, he initiated a deadly confrontation by

3   assaulting Lam, that Lam, in self-defense, drew a knife, and that Petitioner killed him with a

4   baseball bat.  At worst, Petitioner first instigated the altercation and then concluded it by killing

5   Lam without the latter defending himself at all.  In all of this, the principal question for the jury

6   was whether the prosecution had met its burden in proving beyond a reasonable doubt that the

7   blows Petitioner gave to Lam were accomplished with intent to kill or were a product of such

8   claimed self-defense.  There is nothing in the record to suggest that, had the trial court clarified or

9   amplified the language in CALJIC No. 5.17, that the jury would have found the Petitioner had no

10  intent to kill.  Therefore, in light of the record as a whole, the Court cannot say that the alleged

11  instructional error had a "substantial and injurious effect or influence in determining the jury's

12  verdict.  Brecht, 507 U.S. at 637.

13      Accordingly, the state court's decision was neither contrary to nor an unreasonable

14  application of clearly-established federal law.  Thus, Ground One will be denied.

15

16      **Ground Two            The trial court erred in giving CALJIC No. 2.06**

17      Petitioner next contends that the trial court erred in failing sua sponte to clarify CALJIC

18  No. 2.06, because that instruction, as given, misleadingly suggested that consciousness of guilt

19  could be considered in determining the degree of homicide.  (Doc. 9, p. 9).  Petitioner also

20  contends that the instruction might have caused the jury to equate "consciousness of guilt" with a

21  confession, i.e., establishing malice as well as the commission of a killing, which could have in

22  turn lessened the State's burden of proof.  (Id. at p. 11).  These contentions, too, are without merit.

23      At trial, the jury was instructed with CALJIC No. 2.06, as follows:

24      If you find that a defendant attempted to suppress evidence against himself in any manner,
        such as by destroying or concealing evidence this attempt may be considered by you as a
25      circumstance tending to show consciousness of guilt.  However, this conduct is not
        sufficient by itself to prove guilt, and its weight and significance, if any, are for you to
26      decide.

27  (CT 166; RT 461-462).

28  ///

15

1    In its opinion, the 5th DCA rejected Petitioner's argument as follows:

2    Although appellant characterizes the question before the jury as that of the degree of his
     crime, rather than his guilt, "the fact remained that defendant did not plead guilty to any of
3    the charges and the jury had before it the issue of guilt on all charges." [Citations.] Thus,
     CALJIC No. 2.06 did not "unfairly lighten the prosecution's burden of proof as to the
4    degree of homicide in this case." Appellant was charged simply with murder.  Degree is
     not an element of either first or second degree murder. [Citations.]

5
     Appellant's jury was properly instructed on the presumption of innocence and the
6    prosecution's burden of proving guilt beyond a reasonable doubt (CALJIC No. 2.90), that
     the prosecution bore the burden of proving that the killing was not justified or excusable
7    (CALJIC No. 5.15) and, finally that the prosecution bore the burden of proving "beyond a
     reasonable doubt each of the elements of murder and that the act which caused the death
8    was not done in the head of passion or upon a sudden quarrel, or in the actual, even though
     unreasonable, belief [in] the necessity to defend against imminent peril to life or great
9    bodily injury." (CALJIC No. 8.50.)

10   (Doc. 35, LD 1, pp. 13-15).

11        The 5th DCA's reasoned adjudication of this issue was not contrary to nor an unreasonable

12   application of clearly established federal law.  The trial court's CALJIC No. 2.06 instruction to

13   the jury, directing its attention to specific items of evidence from which an inference of guilt could

14   be drawn, was not, contrary to Petitioner's assertions, constitutional error.  The jury instruction

15   leaves resolution of the factual dispute to the jury and informs the jury that even if they found that

16   Petitioner had returned to Lam's body, retrieved personal belongings from the victim, and

17   afterward discarded them along the road, such conduct was "not sufficient by itself to prove

18   guilt."  Because the inference suggested by the instruction was permissive and not mandatory, the

19   instruction did not improperly shift the government's burden of proof.  See Francis v. Franklin,

20   471 U.S. 307, 314-315 (1985)(permissive inference in a jury instruction is not a violation of due

21   process); Turner v. Marshall, 63 F.3d 807, 820 (9th Cir. 1995)(upholding a similar consciousness-

22   of-guilt instruction given pursuant to CALJIC No. 2.03), overruled on other grounds by Tolbert v.

23   Page, 182 F.3d 677 (9th Cir. 1999)(en banc).  Moreover, the testimony at trial provided ample

24   factual basis for this instruction.

25        Finally, as with Ground One, the Court cannot say that, had a "clarified" CALJIC No. 2.06

26   instruction been given instead of the challenged instruction, the jury would have found the

27   Petitioner had no intent to kill or that the instruction as given lessened the prosecution's burden of

28   proof by causing the jury to confuse "consciousness of guilt" with malice.  Therefore, considering

1    all of the instructions as a whole, the Court cannot say that the alleged instructional error had a

2    "substantial and injurious effect or influence in determining the jury's verdict. Brecht, 507 U.S. at

3    637.

4           For these reasons, the state court's adjudication of this issue was not contrary to nor an

5    unreasonable application of clearly established federal law.  Thus, Ground Two is denied.

6

7           **Ground Three          The trial court erred in giving CALJIC No. 2.11.5**

8           Petitioner next contends that the CALJIC No. 2.11.5 instruction was inapplicable and

9    incorrect as applied to Mesa and Camarillo.  (Doc. 9, p. 15).  Petitioner contends that giving the

10   instruction skewed the jury's credibility determination of both witnesses to Petitioner's detriment,

11   and thus was "tantamount to not permitting cross-examination on the issue" of the witness's

12   credibility.  (Id. at p. 16).  Again, Petitioner's contention fails.

13          At trial, the jury was instructed with CALJIC No. 2.11.5 as follows:

14          There has been evidence in this case indicating that a person other than defendant was or
            may have been involved in the crime for which the defendant is on trial.

15
            There may be many reasons why that person is not here on trial.  Therefore, do not discuss
16          or give any consideration as to why the other person is not being prosecuted in this trial or
            whether he has been or will be prosecuted.  Your sole duty is to decide whether the People
17          have proved the guilt of the defendant on trial.

18   (CT 168; RT 462).

19          Petitioner contends that the instruction should not have been given when the "person other

20   than defendant [who] was or may have been involved in the crime" testifies for either the defense

21   or the prosecution because it precluded the jurors from assessing Mesa and Camarillo's plea

22   bargains in evaluating their testimony.

23          In its opinion, the 5th DCA held as follows:

24          "The purpose of the challenged instruction is to discourage the jury from irrelevant
            speculation about the prosecution's reasons for not jointly prosecuting all those shown by
25          the evidence to have participated in the perpetration of the charged offenses, and also to
            discourage speculation about the eventual fates of unjoined perpetrators." [Citations.]
26          Appellant's jury knew the fates of Mesa and Camarillo and that they were testifying under
            a grant of immunity.
27
            Our Supreme Court has repeatedly addressed and rejected the contention that CALJIC No.
28          2.11.5 directs a jury, in determining an immunized witnesses' credibility, to disregard the
            witnesses' expectations of leniency in testifying for the prosecution. [Citations.]

17

1

2

"...When the challenged instruction is considered in light of the entire charge, we are persuaded a reasonable juror would not have understood it as precluding the jury from considering the immunity granted to prosecution witnesses in assessing the credibility of those witnesses....When the instruction is given with the full panoply of witness credibility and accomplice instructions, as it was in this case, a reasonable juror will understand that although the separate prosecution or non-prosecution of co-participants, and the reasons therefor, may not be considered on the issue of the charged defendant's guilt, a plea bargain or grant of immunity may be considered as evidence of interest or bias in assessing the credibility of prosecution witnesses. [Citations.]" <u>People v. Price</u>, [(1991) 1 Cal.4th 324, 446].

3

4

5

6

In this instance, the jury received the "full panoply of witness credibility and accomplice instructions." Including CALJIC Nos. 1.01 [instructions to be considered as a whole], 2.20 [believability of a witness], 2.21.1 [discrepancies in testimony], 2.21.2 [witness willfully false], 2.22 [weighing conflicting testimony], 3.10 [accomplice–defined], 3.11 [testimony of accomplice must be corroborated], 3.12 [sufficiency of evidence to corroborate an accomplice], 3.14 [criminal intent necessary to make one an accomplice], 3.16 [witness accomplice as matter of la], 3.18 [testimony of accomplice to be viewed with distrust], and 3.19 [burden to prove corroborating witness is an accomplice].

7

8

9

10

11

Additionally, defense counsel's argument made it clear the jury could consider Camarillo's grants of immunity in determining his credibility. Consequently, an error in giving CALJIC No. 2.11.5 was harmless because it is unlikely the jury would have reached a different verdict absent the instruction.

12

13

(Doc. 35, LD 1, pp. 15-17).

14

The Court agrees with the state court's adjudication of this issue. As the 5th DCA pointed

15

out, the jury was fully instructed on all aspects of accomplice testimony, witness bias, and the

16

appropriate burdens of proof. The jury was made aware that it could consider Camarillo's grant

17

of immunity in determining his credibility and that an accomplice's testimony should be viewed

18

with distrust, examined with care and caution, and corroborated. When read in conjunction with

19

the other instructions regarding witness bias, CALJIC No. 2.11.5 can reasonably be understood to

20

preclude speculation as to prosecution or non-prosecution of other participants, but <u>not</u>, as

21

Petitioner contends, to preclude consideration of evidence going to the question of witness bias or

22

credibility. Given the trial court's clear instruction that the jury could consider the bias of any

23

witness by reference to "anything" that "has a tendency" to show bias (CT 170), there is no

24

reasonable likelihood that CALJIC No. 2.11.5 would have precluded the jury from considering

25

Camarillo's potential bias resulting from a plea agreement. <u>See Allen v. Woodford</u>, 395 F.3d 979,

26

996 (9th Cir. 2005)(giving CALJIC No. 2.11.5 was harmless error given the totality of the

27

///

28

18

instructions).  Thus, the court's use of the challenged instruction did not render the trial

fundamentally unfair so as to violate due process.

Nor, as with Petitioner's previous instructional challenges, was the error of such

magnitude that this Court could conclude that, had CALJIC No. 2.11.5 not been given, the jury

would have reached a better result for Petitioner.  Therefore, considering all of the instructions as

a whole, the Court cannot say that the alleged instructional error had a "substantial and injurious

effect or influence in determining the jury's verdict.  Brecht, 507 U.S. at 637.

For these reasons, the state court's adjudication of this issue was not contrary to nor an

unreasonable application of clearly established federal law.  Thus, Ground Three is denied.


**Ground Four**        **The trial court committed error in refusing to submit to the**
                       **jury the question of whether or not Rafael Mesa was an**
                       **accomplice**

Petitioner next contends that the trial court erred by not instructing the jury to consider

Mesa an accomplice, thus subjecting his testimony and credibility to the various jury instructions

that address the evaluation of accomplice testimony.  (Doc. 9, p. 20).  Petitioner argues that by not

adding Mesa's name to the CALJIC No. 3.19, the State's burden was improperly lightened by

giving Mesa's testimony "undue weight with the jury, and by permitting Mesa's testimony to

provide corroboration of Camarillo's testimony."  (Id. at p. 23).  Once more, this contention lacks

merit.

In its opinion, the 5th DCA held that, although there was evidence that Mesa could be

charged as an accessory after the fact in light of his conduct, e.g., driving Petitioner from the

scene, hiding Lam's wallet, etc., there "was insufficient evidence from which the jury could even

infer that Mesa was an accomplice."  (Doc. 35, LD 1, p. 20).  Thus, the 5th DCA reasoned, the

question was one of law for the trial court and the court's decision not to name Mesa as an

accomplice was not erroneous under California law.  (Id.).

In reaching this result, the Court of Appeal first examined the evidence presented

regarding Mesa:

///

Appellant contends that Mesa could be found to have aided and abetted appellant's crime because he drove the car, supplied the bat, and encouraged Lam to return to the vehicle. Mesa did nothing to stop the attack, and returned to the scene to retrieve the wallet, which he kept. Furthermore, Mesa helped dispose of evidence of the crime.

This evidence does not indicate that Mesa aided, promoted, encouraged or instigated the killing. Mesa understood little Spanish; he offered Lam a ride on appellant's representation that Lam needed a ride home. He followed the directions given to him by appellant. Mesa testified the bat was in the back seat of his car because he forgot to take it out after he moved. Mesa had no part in giving appellant the bat. The alleged argument between Lam and appellant apparently started after Lam reentered the vehicle. However, Mesa could not understand the conversation between appellant and Lam; he knew only that Lam was angry. No evidence suggests that Mesa knew that appellant was going to assault Lam and he did nothing to assist once the attack began.

Even had Mesa known that a crime might be committed by appellant in the future, his knowledge did not amount to aiding and abetting the commission of the prospective crime. [Citations.] Mesa's presence at scene of the crime and intimate knowledge of the attack, without more, merely means that he was an eyewitness and not necessarily an accomplice to the crimes. [Citations.]

Although Mesa's conduct after the commission of the crime implicated him as an accessory after the fact, his status as accessory would not subject him to accomplice liability. [Citations.]

(Doc. 35, LD 1, pp. 19-20).

In so ruling, the 5th DCA was deferring to the trial court's factual finding that Mesa was not an accomplice. At trial, defense counsel requested an accomplice instruction for both Mesa and Camarillo. (RT 416). The judge rejected the instruction as to Mesa as follows:

All right. With respect to the accomplice instructions, I've been thinking about that a lot. The primary instruction is 3.10. An accomplice is a person who is subject to prosecution for the identical offense charged against the defendant on proper reason of aiding or abetting or being a member of a criminal conspiracy.

Thinking about it some more, I can't visualize [Mesa] being an accomplice, thinking about it in terms of the murder, but as to [Camarillo], I can because he handed the bat over from the back, so I am going to give 31...

Criminal intent necessary to make one accomplice, 314, testimony of accomplice to be viewed with distrust. 319, burden of proof is on the defendant. Okay. This is the one where we get the name. You must determine whether the witness, Ramon Camarillo, is an accomplice and find that true. The defendant has the burden of proving by a preponderance of the evidence that Ramon Camarillo was an accomplice in the crime charged against the defendant, and then I have to give 250.2, which is preponderance of the evidence. So I'm going to do it as to Ramon but not as to Rafael, based on what I said.

(RT 417).

Here, both the trial court and the 5th DCA agreed that insufficient evidence existed to support a finding that Mesa had aided or abetted Petitioner <u>before</u> or <u>during</u> the commission of the

1   crime, although he may well have done so <u>after</u> the fact.  As discussed earlier, under California

2   law, a defendant is entitled to a jury instruction only if "substantial evidence, or evidence

3   sufficient to deserve consideration by the jury," supports the giving of that instruction.  <u>Barton</u>, 12

4   Cal.4th at 201 & n. 8.

5        Thus, the resolution of Petitioner's claim depends essentially on whether sufficient

6   evidence was presented at trial to support giving an interrogatory to the jury asking it to make a

7   finding whether Mesa was an accomplice.  The only evidence Petitioner offers to support such a

8   finding is that Mesa "drove the car and provided the bat, which became the murder weapon."

9   (Doc. 9, p. 22).  Moreover, after the return trip to the Mobil station, Mesa was the one who told

10  Lam to get back into the car, and then when Petitioner commenced the assault, Mesa did nothing

11  to stop him.  (<u>Id.</u>).

12       The state court considered all of this evidence and determined it was insufficient to

13  establish that Mesa was an accomplice under California law.   As discussed in the 5th DCA's

14  opinion, the mere fact that Mesa was driving the car, offered Lam a ride, and that he had a

15  baseball bat in the back of the car that Petitioner asked for, received from Camarillo, and used to

16  kill Lam, does not establish that Mesa aided or abetted Petitioner in the commission of the crime.

17  As the 5th DCA pointed out, he happened to be present and was an eyewitness.  While Mesa's

18  conduct subsequent to the murder may indeed subject him to criminal liability, it would not be as

19  an accomplice since the crime had already been committed at that point.  Accordingly, the state

20  court correctly rejected Petitioner's argument.

21       In sum, Petitioner has failed to establish that the state court adjudication of this issue was

22  contrary to or an unreasonable application of clearly established federal law.  Thus, Ground Four

23  must be denied.

24  **Ground Five**          **The trial court erred in not sua sponte instructing the jury on**
25                           **the burden of proof in a self-defense case**

26  Petitioner maintains that the trial court "failed to specifically instruct the jury on the

27  burden of proof with regard to appellant's claim of imperfect self-defense."  (Doc. 9, p. 24).

28  Petitioner argues that this error "unduly lightened the prosecution's burden of proof beyond a

21

1  reasonable doubt, infringing [Petitioner] right to due process of law."  (Id. at p. 25).  Petitioner's

2  contention is misguided.

3      Petitioner raised this argument in his direct appeal in state court, and the 5th DCA's

4  opinion rejecting this claim pointed out that, contrary to Petitioner's assertion, the jury was indeed

5  instructed with CALJIC No. 8.50.  (Doc. 35, LD 1, pp. 20-21).  The jury was instructed as

6  follows:

7      "To establish that the killing is murder and not manslaughter, the burden in on the People
       to prove beyond a reasonable doubt each of the elements of murder and that the act which
8      caused the death was not done in the heat of passion or upon a sudden quarrel *or in the
       actual, even though unreasonable, belief [in] the necessity to defend against imminent
9      peril to life or great bodily injury*."

10  (CT 217; RT 481-482.)(Emphasis supplied.)

11      Here, Petitioner's entire argument is premised upon the faulty assumption that the jury was

12  not instructed on the prosecution's burden regarding his claim of imperfect self-defense.  Because

13  that assumption is belied by the record before the Court, the argument has no merit and the state

14  court's adjudication was, ipso facto, not contrary to nor an unreasonable application of clearly

15  established federal law.  Thus, Ground Five is denied.

16

17  **III.b   Claims in the supplemental filing of December 6, 2004**

18      Initially, the Court notes that Respondent contends that all of the claims raised in the

19  supplemental filing of December 6, 2004 are untimely because they were filed beyond the one-

20  year statute of limitations contained in the AEDPA and the claims are not saved by "relating

21  back" to the original claims in the petition or amended petition.  (Doc. 34, p. 20-24).  The Court

22  agrees that the claims are untimely.

23      **(1)  The AEDPA's One-Year Statute of Limitation**

24      The AEDPA imposes various requirements on all petitions for writ of habeas corpus filed

25  after the date of its enactment.  Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997);

26  Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (en banc), cert. denied, 118 S.Ct. 586

27  (1997).  The original petition in this case was filed on March 1, 2004 (Doc. 1), and thus, it is

28  subject to the provisions of the AEDPA.

The AEDPA imposes a one year period of limitation on petitioners seeking to file a federal petition for writ of habeas corpus. 28 U.S.C. § 2244(d)(1). As amended, § 2244, subdivision (d) reads:

> (1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of –
>
>     (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
>     (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
>     (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
>     (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.
>
> (2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d).

### (2) All Of The Claims In Petitioner's Supplemental Filing Are Untimely Under The AEDPA

In the prior proceedings in this case concerning Respondent's motion to dismiss on statute of limitations grounds, this Court ruled that, based on equitable tolling for Petitioner's mental incapacity, Petitioner's original petition was timely as filed on February 25, 2004. (Doc. 33, p. 13.) However, the Court also concluded that February 25, 2004 was the last day of the AEDPA one-year limitation period, as extended by equitable tolling. (Id.). Thus, any claims filed beyond that date must relate back to the claims in the original petition or else they would be untimely under the AEDPA. See Anthony v. Cambra, 236 F.3d 568, 576 (9th Cir. 2000).

Here, it is uncontroverted that Petitioner filed his supplemental issues on December 6, 2004, over nine months after the limitations period had expired. (Doc. 16). Thus, unless the claims relate back to the original claims, they are untimely and must be excluded.

Rule 15 of the Federal Rules of Civil Procedure provides in part that "an amendment of a pleading elates back to the date of the original pleading" when one of three alternative provisions are met.  Subdivision (c)(2) allows an amendment to relate back when:

> the claim...asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading.

Fed.R.Civ.P. 15(c)(2); see also 28 U.S.C. § 2242 (habeas petitions may be amended in conformance with civil rules); Rule 11, Rules Governing Section 2254 Cases (civil rules apply if not inconsistent with statute or habeas rules).

In Mayle v. Felix, 545 U.S. 644, 125 S.Ct. 2562 (2005), the Supreme Court examined the interaction between the AEDPA statute of limitations and the relation-back provisions of Rule 15(c)(2).  The original petition in that case contained a single Sixth Amendment claim based on the admission of a witness's videotaped out-of-court statement.  After the statute of limitations had run, petitioner Felix filed an amended petition, which added a Fifth Amendment claim stemming from the admission of Felix's pre-trial statements to the police and a Sixth Amendment claim of appellate counsel's ineffectiveness for failing to challenge the use of Felix's statements on appeal.  Id. at 650-651.

To determine whether Felix's amended claims related back to the original petition, the court focused on the "key words" of Rule 15(c)(2), i.e., "conduct, transaction, or occurrence," and found that "relation back depends on the existence of a common 'core of operative facts' uniting the original and newly asserted claims."  Id. at 657-658.  Felix's amended petition did not meet this standard because it "targeted separate episodes, the pretrial police interrogation of witness Williams in his original petition, his own interrogation at a different time and place in his amended petition."  Id. at 2572.

The Court also relied on Habeas Rule 2, which instructs a petitioner to specify all grounds for relief and state the facts supporting each ground.

> Under that Rule, Felix's Confrontations Clause claim would be pleaded discretely, as would his self-incrimination claim.  Each separate congeries of facts supporting the grounds for relief, the Rule suggests, would delineate an "occurrence."

Mayle, 545 U.S. at 661.  In a footnote, the Court cited two proper examples of "relating back."

1   The first involved an original challenge to the prosecution's failure to comply with its obligation

2   to provide exculpatory materials to the defense and an amended petition raising the failure to

3   provide a particular report.  The Court noted that both pleadings "related to evidence obtained at

4   the same time by the same police department."  Id.. at 664, n. 7.  The second involved an original

5   petition challenging the trial court's admission of a witness's recanted statements, while the

6   amended petition challenged the court's refusal to allow the defendant to show the statements had

7   been recanted.  Id..

8        In United States v. Ciampi, 419 F.3d 20 (1st Cir. 2005), the movant filed a pro se petition

9   challenging, among other things, the district court's failure adequately to inquire into the movant's

10  understanding of the provision for the waiver of appellate rights included in his plead agreement

11  and ineffective assistance of counsel based on his attorney's failure to investigate misstatements in

12  the indictment.  Id. at 24.  Counsel was appointed and then filed an amended petition raising

13  counsel's ineffectiveness for failing to adequately advise him to appeal one of the counts of

14  conviction and to explain the waiver of appeal.  Id. at 22, 24.

15       The Ciampi court found that the new claims did not relate back under Mayle.  Although

16  both claims "generally related to [movant's] 'understanding' of his appellate waiver," they

17  focused on wholly different aspects and actors.  Id. at 24.  Moreover, the claim of ineffective

18  assistance of counsel in the original petition was based on different occurrences:

19       [A] petitioner does not satisfy the Rule 15 "relation back" standard merely by raising some
         type of ineffective assistance in the original petition, and then amending the petition to
20       assert another ineffective assistance claim based on an entirely distinct type of attorney
         misfeasance.Id. at 24.  Similarly, a case cited with approval in Mayle held relation back
21       would be proper if a claim in an amended petition clarifies or amplifies a claim raised in
         the original petition, but would not be allowed if it added a new claim or inserted a new
22       theory into the case.  Woodward v. Williams, 263 F.3d 1135, 1142 (10th Cir. 2001)(cited
         in Mayle, 125 S.Ct. at 2575 n. 7).
23

24       Applying the Mayle test to this case, the Court finds that the claims raised in the

25  supplemental filing of December 6, 2004, do not relate back to the claims raised in the original

26  petition.  Here, the five claims in the original petition involve challenges to the trial court's charge

27  to the jury.  With the parties' input, the trial court finalizes the jury instructions at the close of the

28  evidence.  Evaluation of jury instruction error requires a reviewing court to consider the impact of

1  the omitted or incorrect instruction in the context of the overall charge.  Boyde v. California, 494

2  U.S. 370, 378 (1990).   In so doing, the Court must consider whether the erroneous instruction or

3  failure to instruct so infected the trial that the petitioner's due process rights were violated.

4  Estelle, 502 U.S. at 72.

5        The claims in the supplemental filing all involve claims of ineffective assistance of trial

6  and appellate counsel.  Claims of trial counsel's ineffectiveness require the Court to assess the

7  performance of trial counsel throughout the pre-trial and trial processes, and to determine whether

8  counsel's performance fell below an objective standard of reasonableness, and, if so, whether, but

9  for counsel's ineffective representation, there was a reasonable probability that the outcome of the

10  proceedings would have been different.  Strickland v. Washington, 466 U.S. 668, 687-688 (1984).

11   With Petitioner's claim of ineffective assistance of appellate counsel, the Court must consider

12  whether counsel's performance during the appellate process violated the Sixth Amendment,

13  although there is some attenuated connection to the trial process as well.  Id.  Neither

14  ineffectiveness of trial or appellate counsel involves an analysis of whether the Court correctly

15  instructed the jury or whether the trial court's erroneous instructions or failure to instruct so

16  infected the trial that a petitioner's due process rights were violated.

17        From the foregoing comparison, the Court concludes that the claims in the supplemental

18  filing do not amplify or clarify any of the original claims, but instead are based on different

19  aspects of the criminal process, and involve different theories and analyses than those presented in

20  the original petition.  Moreover, the claims in the supplemental filing do not arise out of the same

21  core of operative facts as those underlying the original claims based on jury instructional error.

22  Mayle, 125 S.Ct. at 2567-2568.[4]  Accordingly, the claims in the supplemental filing of December

23  6, 2004, do not relate back to the initial petition.  Because they were filed after the AEDPA statute

24  of limitations had run, they are not properly before this Court and therefore those claims should be

25  dismissed as untimely.

26  _____

27        [4]Respondent correctly notes that Ground Six involves an allegation of ineffectiveness related to counsel's
    failure to object to an instruction that is challenged in the original petition.  (Doc. 34, p. 24).  However, as

28  Respondent correctly argues, the two claims are legally distinct, require completely different legal analyses, and are
    based upon different conduct, i.e., sua sponte instruction by the trial court and a timely objection by trial counsel.
    See Mayle, 545 U.S. at 664, n. 7.

1   However, even assuming arguendo, that the claims in the supplemental filing were timely,

2   they are nonetheless without merit and the Court denies the claims on their merits as well.

4   **Ground Six**      **Ineffective assistance of trial counsel in failing to object to**
                        **prosecutor's misstatement of law regarding CALJIC No. 2.06**

6   **(1)  The Standard For Ineffective Assistance of Counsel**

7   In a petition for writ of habeas corpus alleging ineffective assistance of counsel, the Court

8   must consider two factors.  Strickland v. Washington, 466 U.S. at 687; Lowry v. Lewis, 21 F.3d

9   344, 346 (9th Cir. 1994).  First, the petitioner must show that counsel's performance was

10  deficient, requiring a showing that counsel made errors so serious that he or she was not

11  functioning as the "counsel" guaranteed by the Sixth Amendment.  Strickland, 466 U.S. at 687.

12  To establish this, the petitioner must show that counsel's representation fell below an objective

13  standard of reasonableness.  Id. at 688.  The petitioner must identify counsel's alleged acts or

14  omissions that were not the result of reasonable professional judgment considering the

15  circumstances.  Id.; United States v. Quintero-Barraza, 78 F.3d 1344, 1348 (9th Cir. 1995).

16  Judicial scrutiny of counsel's performance is highly deferential, and a court indulges a strong

17  presumption that counsel's conduct falls within the wide range of reasonable professional

18  assistance.  Strickland, 466 U.S. at 687; Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir. 1994).

19  Second, a petitioner must show prejudice, i.e., whether counsel's errors were so egregious

20  as to deprive him of a fair trial, one whose result is reliable.  Strickland, 466 U.S. at 688, 694.  To

21  establish prejudice, petitioner "must show that there is a reasonable probability that, but for

22  counsel's unprofessional errors, the result of the proceeding would have been different.  A

23  reasonable probability is a probability sufficient to undermine confidence in the outcome."  Id.;

24  Williams v. Taylor, 529 U.S. 362, 391 (2000).    In so doing, the Court must also evaluate whether

25  the entire trial was fundamentally unfair or unreliable because of counsel's ineffectiveness.  Id.;

26  Quintero-Barraza, 78 F.3d at 1345; United States v. Palomba, 31 F.3d 1456, 1461 (9th Cir. 1994).

27  The Court does not need to consider the two elements in any particular order, nor does the

28  Court need to consider both if the showing on either one is insufficient.  Strickland, 466 U.S. at

697.  A court need not determine whether counsel's performance was deficient before examining

the prejudice suffered by the petitioner as a result of the alleged deficiencies.  Id.  The object of

an ineffectiveness claim is not to grade counsel's performance.  Id.  "If it is easier to dispose of an

ineffective claim on the ground of lack of sufficient prejudice, which we expect will often be so,

that course should be followed."  Id.

With these principles in mind, the Court now turns to an analysis of Petitioner's claims of

ineffective assistance of counsel.

**(2)  Petitioner Was Not Denied the Effective Assistance of Counsel**

Petitioner contends that he was denied the effective assistance of counsel when trial

counsel failed to object to the prosecutor's purported misstatement of CALJIC No. 2.06 during

closing argument.  (Doc. 16, p. 2).  This contention is without merit.

Petitioner does not point to any specific comments of the prosecutor in closing argument.

Instead, he refers to the 5th DCA's opinion, which makes the following observation:

> "Appellant seeks to distinguish these cases on the grounds that the prosecutor explicitly
> asked the jury to consider appellant's consciousness of guilt in determining the degree of
> homicide.  While it is improper for a prosecutor to misstate the law, appellant did not
> object to the prosecutor's closing argument, and this claim of error is waived."

(Doc. 35, LD 1, p. 13).

Significantly, however, the 5th DCA's opinion never characterizes the prosecutor's

comments as actually being improper, nor does the appellate court point to any particular language

as potentially being improper.  The court merely observes that any potential error regarding the

prosecutor's comments had been waived by trial counsel's failure to object.  Petitioner has the

burden to establish error in a habeas proceeding; this Court will not speculate about what portion

of the record might contain improper prosecutorial comments.  Petitioner's appellate counsel

contended in the Petition for Review that the prosecutor "explicitly requested the jury to use the

consciousness of guilt evidence in fixing the degree of culpability...."  (Doc. 35, LD 2, p. 12).

However, again, counsel did not identify a specific portion of the record where such comments

were made.

///

1    The only portion of the record that contains anything remotely touching on this issue

2    occurs when the prosecutor talked about the difference between first and second degree murder.

3    (RT 429-430).  The prosecutor began by giving an example of how someone who has committed

4    second-degree murder might have pangs of conscience or guilt afterward and want to confess.

5    (RT 429).  He then continues:

6          There's another level, and maybe you can imagine that if you have the intent to kill in, for
             example, a second degree murder situation, but now try and imagine–try and imagine that
7          accidental intent to kill situation with a person who goes back home with his friends,
             drinks some beer, and decides then to go back for the trophies of the killing, who decides
8          to go back for a dollar, decides to go back, step near or on the head of the person that
             you've just murdered.  It's the only place there was a significant amount of blood on the
9          grass there; to step in or around that head, reach down, and in one of the pockets of this
             dead corpse, retrieve the only valuable possession that corpse had, a wallet with a dollar.
10         After you've taken that wallet with the dollar, do you stop?  Do you stammer?  Do you
             think about it?  No, this person did not.  Mr. Galaz did not.

11

12         Mr. Galaz took the wallet, got back in the car, and started throwing the contents out the
             window, man's life out the window.  *The conduct, the words after the killing, what he did
             is all evidence of his intent to kill in this cold-blooded murder.*

13

14   (RT 430)(Emphasis supplied).

15         Assuming that this is the portion of the record to which Petitioner's appellate counsel had

16   been referring, it is clear that, although the prosecutor begins with a reference to consciousness of

17   guilt for purposes of second-degree murder, he specifically discusses Petitioner's <u>conduct</u> and

18   <u>statements</u> after the killing, not consciousness of guilt, as evidence supporting a finding of pre-

19   meditation.  It does not appear, therefore, to be improper in any respect.  If other portions of the

20   Reporter's Transcript contain improper comments, this Court could not find them and Petitioner

21   has provided no assistance in identifying and locating them.

22         Based on the foregoing, the Court remains unconvinced that any improper comments were

23   made by the prosecutor in his closing argument.  Thus, trial counsel's failure to object to imagined

24   but non-existent improper comments cannot be the basis of a viable ineffectiveness of counsel

25   claim.  There is no defective performance; there is no prejudice.  The claim is groundless.

26   ///

27   ///

28   ///

| 1 | **Ground Seven** | **Ineffective assistance of trial counsel for not investigating instances of juror misconduct** |

Petitioner next maintains that trial counsel was ineffective for not investigating purported instances of juror misconduct. (Doc. 16, pp. 4-6.) This contention is also without merit.

Petitioner claims that on three occasions he told his trial attorney about juror misconduct that he had observed. First, a witness overheard one juror discussing the juror's biases and beliefs about the case during a break in trial. Second, a juror was overheard asking the court clerk whether a particular piece of evidence had been found on Petitioner. Third, Petitioner's mother apparently engaged in a conversation with one juror who told her, not knowing she was Petitioner's mother, that the jurors had already decided that Petitioner was guilty. (Id.). Petitioner related each of these instances to his attorney, but the attorney did not raise the issue with the trial court.

As Respondent correctly points out, Petitioner's claims of juror misconduct are completely unsubstantiated: there is no state court record of such events, nor any declarations of jurors or witnesses to these purported conversations, nor indeed, save Petitioner's own averments, is there any evidence that the events actually happened. As a result, it is unclear precisely what was said or in what context or to whom. Petitioner has the burden to establish that constitutional error even occurred. See, e.g., Garlotte v. Fordice, 515 U.S. 39, 46 (1995). In this instance, the Court cannot say with any certainty that the events ever occurred, or, if they did, what precisely transpired. Given that the claim is based almost entirely on speculation, the Court cannot conclude that Petitioner's Sixth Amendment right to effective counsel was violated.

**Ground Eight**      **Ineffective assistance of trial counsel in not utilizing experts or investigator services**

Petitioner next maintains that trial counsel was ineffective in not utilizing the $5,000 granted by the trial court for investigator and expert witness services. (Doc. 16, pp. 6-8). Petitioner maintains that he gave a list of witnesses and evidence to his attorney before trial, that his attorney presumably agreed that these witnesses and evidence were important enough that he

requested, and received, $5,000 in additional compensation for them, but that counsel did not actually investigate or utilize the experts or investigators.  (Id.).  This contention is likewise without merit.

Apart from the granting of the $5,000 in investigative fees, the record is devoid of any information regarding this issue, and Petitioner does not provide any additional information in his supplemental filing of December 6, 2004.  He assumes, without any proof, that (1) his attorney did not utilize the $5,000, and (2) because his counsel did not utilize the $5,000, that counsel's representation was necessarily defective.  These conclusions do not follow from Petitioner's premises.  Petitioner has not identified any specific potential witness or potential piece of evidence that should have been investigated by a reasonably competent attorney but was not by his trial counsel.  Nor does Petitioner explain how such potential witnesses or evidence, if investigated, would have resulted in a better outcome for him at trial.  Accordingly, he has failed to meet either prong of the Strickland standard.

**Ground Nine**     **Ineffective assistance of appellate counsel for abandoning the juror misconduct issue**

Finally, Petitioner contends that he was denied effective appellate counsel because counsel failed to pursue the investigation of juror misconduct.  (Doc. 16, pp. 8-10).  Again, this contention fails.

In challenges to the effective assistance of appellate counsel, the same standards apply as with the claims of ineffective assistance of trial counsel.  Smith v. Robbins, 528 U.S. 259, 285 (2000); Smith v. Murray, 477 U.S. 527 (1986).   In Smith, the United States Supreme Court indicated that an appellate attorney filing a merits brief need not and should not raise every non-frivolous claim.  Robbins, 528 U.S. at 288.  Rather, an attorney may select from among them in order to maximize the likelihood of success on appeal.  Id.  As a result, there is no requirement that an appellate attorney raise issues that are clearly untenable.  Gustave v. United States, 627 F.2d 901, 906 (9th Cir. 1980).

///

1   Here, Petitioner maintains that a preliminary investigation revealed that a witness

2   overheard two jurors, Teresa Henderson and Kay Best, discussing the case during a break in trial.

3   Petitioner's investigator contacted Henderson by telephone, but Henderson denied that the

4   conversation ever took place.  (Doc. 16, p. 8).  Petitioner argues that the witness was willing to

5   testify under oath to the conversation but that appellate counsel simply accepted "Henderson's

6   denial as true" without pursuing the investigation further.  (Id.).

7   Again, Petitioner fails to identify any portion of the state court record that would support

8   his allegations.  Again, the Court is left with Petitioner's self-serving averments as the only basis

9   for the events about which he complains.  As with the preceding issues, that is insufficient to

10  support a claim of ineffectiveness of counsel.  Petitioner bears the burden of showing that the

11  events even occurred and of establishing the precise nature of what occurred before the Court can

12  undertake a legitimate Strickland analysis.  Absent such evidence in the record, Petitioner is

13  essentially asking the Court to accept his version of events on faith and inviting this Court to

14  speculate about events that might, or might not, have occurred and that might, or might not, if

15  proven, establish attorney ineffectiveness.  The Court declines Petitioner's invitation.

16  Accordingly, Petitioner has failed to show that the state court's adjudication of this issue

17  was contrary to or an unreasonable application of clearly established federal law.  Thus, Ground

18  Nine is denied.

19                                          **ORDER**

20  Accordingly, for the reasons set forth above, the Court HEREBY ORDERS as follows:

21  1.      The Amended Petition for Writ of Habeas Corpus (Doc. 9), is DENIED with

22          prejudice; and,

23  2.      The Clerk of Court is DIRECTED to enter judgment in favor of Respondent and

24          close the file.

25  IT IS SO ORDERED.

26  Dated:   **March 26, 2007**                        _____/s/ **Theresa A. Goldner**_____
    **j6eb3d**                                         UNITED STATES MAGISTRATE JUDGE

27

28